**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PRESIDIO, INC.,** *et al.*, | : | |
| | : | **Case. No. 2:22-cv-03838** |
| **Plaintiffs,** | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge Elizabeth P. Deavers** |
| **DAVID HATTON,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

<u>**OPINION & ORDER**</u>

## I.    INTRODUCTION

This case arises out of allegations of breach of contract, tortious interference, and unfair competition by Plaintiffs Presidio, Inc. ("Presidio"), Presidio Networked Solutions, LLC ("PNS"), and Presidio Networked Solutions Group, LLC ("PNSG"), against Defendants People Driven Technology, Inc. ("PDT"), and David Hatton. The alleged misconduct is just one component of a larger pattern of corporate sabotage alleged by Plaintiffs against PDT, which is the subject of another action (*Presidio, Inc. v. People Driven Technology, Inc.*, 2:21-cv-05779) before this Court. This case has since been consolidated with that related action. (*See* Order, ECF No. 37).

Now before the Court is Defendants' Rule 12(b)(6) Motion to Dismiss (ECF No. 19). For the reasons stated more fully herein, Defendants' Motion is **GRANTED IN PART and DENIED IN PART**.

## II.    BACKGROUND

### A.    Factual Background

The various Presidio plaintiffs are a subset of a group of interrelated corporate entities: PNS is an indirectly wholly-owned subsidiary of Presidio, and PNSG is, in turn, a wholly-owned

subsidiary of PNS (and thus also an indirec subsidiary of Presidio).  (*See* Compl. ¶¶ 10–11, ECF No. 1).  The Presidio plaintiffs provide services for advanced IT solutions, "including design implementation and services for data storage, information security, cyber security, and cloud computing capabilities."  (*Id.* ¶ 18).

On December 31, 2015, Presidio Infrastructure Solutions LLC ("PIS") and its parent company, Presidio Holdings, Inc., another indirectly wholly-owned subsidiary of Presidio, signed an Asset Purchase Agreement ("APA"), to acquire the entirety of Netech Corporation ("Netech") for $250 million.  (*Id.* ¶¶ 26–27).  Netech was a privately-held, family-owned IT services business, which had been founded in 1996 by James Engen.  (*See id.* ¶¶ 23–24).  Defendant Hatton began working at Netech in June 2009.  (*Id.* ¶ 39).  At that time, he signed a non-compete agreement (the "Hatton Non-Compete Agreement"); he later signed a second confidentiality agreement (the "Hatton Confidentiality/Non-Solicitation Agreement") (collectively, the "Hatton Agreements"). (*Id.* ¶¶ 45–40; *see* Defs.' Ex. A & B, ECF No. 19-2, -3).  The Hatton Agreements placed restrictions on Hatton for twelve-months after his employment at Netech ended, including prohibitions against soliciting other employees, agents, or representatives of Netech, engaging in business with existing or recent customers of Netech, or soliciting Netech customers.  (*See* Defs.' Ex. A ¶¶ 1–2, ECF No. 19-2).  The Hatton Non-Compete Agreement stated that its terms "shall be binding upon and inure to the benefit of the parties, their successors, assigns, and personal representatives."  (*Id.* at 1).  The Hatton Confidentiality/Non-Solicitation Agreement similarly stated that "the rights and obligations of Netech under this Agreement shall inure to the benefit and be binding upon Netech's successors and assigns."  (Defs.' Ex. B ¶ 5, ECF No. 19-3).

Pursuant to the APA, the purchasing Presidio entities assumed Netech's contracts with its employees, including "all of Seller's rights existing under Contracts relating to or arising out of

the Business" and "all Liabilities and obligations with respect to Transferred Employees." (Pls.'
Ex. 2 §§ 1.1(b)(iv), 1.2(a)(iii), ECF No. 31-2). The APA closed in early 2016, at which time
Netech and PIS (represented by PNSG as its sole member) entered into an Assignment and
Assumption Agreement ("AAA"), dated February 1, 2016, which assigned certain contracts from
Netech to PIS. (Defs.' Ex. C, ECF No. 19-4). The AAA states that "no party may assign any of
its rights or obligations under this Agreement to any other Person without the prior written consent
of the other party to this Agreement," except for the "Parent" (*i.e.*, Presidio Holdings),[1] "who is
entitled to exercise all rights and remedies granted to Buyer under this Agreement and to enforce
this Assignment on behalf of and/or in the name of Buyer." (*Id.* ¶¶ 4, 6).

Upon closing of the acquisition, PIS merged into PNSG, which thus became PIS's
successor by merger. (*See id.* ¶ 30). At that time, however, Hatton began working not for PIS or
PNSG, but for PNS, which is the direct, 100% owner of PNSG.[2] (Mot. to Dismiss at 3, ECF No.
19; *see* Resp. in Opp'n at 14, ECF No. 31). At PNS, Hatton worked as a Practice Manager out of
the Dublin, Ohio, office, working with various customer accounts and managing a team of
engineers; he also had access to confidential information about statements of work, network
configurations, and work proposals. (*See id.* ¶ 53). Hatton continued working at PNS until July
8, 2022. (*Id.* ¶ 56). During his exit interview with Alicia Korreck, Senior Human Resources
Business Partner at PNS, Hatton acknowledged that, pursuant to the Hatton Agreements, he was
prohibited from soliciting current or recent PNS customers, including customers that also worked
with PDT, for one year. (*Id.* ¶ 58).

---

[1] "Parent," within the meaning of the AAA, is defined by reference to the APA, in which "parent" indicates
Presidio Holdings, Inc. (Defs.' Ex. C ¶ 1, ECF No. 19-4; *see* Pls.' Ex. B art. 9, ECF No. 31-2).
[2] Although Plaintiffs occasionally elide the difference between the Presidio entities in their complaint and
response memorandum, and thus, for example, write that "Hatton began his employment at Presidio[,]" the Court
adopts greater specificity here because the issue of corporate structure and the distinction between parent and
subsidiary corporations are central to Defendants' motion to dismiss. (Pls.' Resp. in Opp'n at 8, ECF No. 31).

Upon leaving PNS, Hatton joined PDT, an IT solutions company founded by Engen and his sons, who had previously operated Netech before selling it to PIS.  The Presidio plaintiffs allege that, since early 2021, PDT has been improperly soliciting PNS employees who formerly worked at Netech and misappropriating PNS trade secrets.  A central pillar of PDT's business plan, according to these allegations, is to expand the business not through organic growth but by hiring away PNS personnel and importing their business wholesale.  (*See id.* ¶ 35).  By Plaintiffs' count, at least 40 of approximately 50 total PDT employees are former PNS personnel.  (*See id.* ¶¶ 35–36).

Hatton represents just one component of this concerted campaign of alleged corporate misconduct.  And since joining PDT, Hatton has submitted work proposals to a PNS client with whom he formerly worked, falsely told a current PNS client that the PNS security engineer assigned to that client was "too busy" to work on the client's network projects and that the client should switch to PDT, and is servicing a former client from his time at PNS on behalf of PDT.  (*Id.* ¶¶ 61, 63–64).  Plaintiffs allege that these actions violate the Hatton Agreements.

## B.    Procedural Background

Three days after Hatton left PNS, on July 11, 2022, he and PDT jointly filed a declaratory judgment action in the U.S. District Court for the Eastern District of Michigan, seeking to have the Hatton Agreements declared unenforceable; that action has since been transferred to this Court, and consolidated with the lead case in this litigation.  (*See* Order, ECF No. 28, 4:22-cv-11564 (E.D. Mich.)).

Plaintiffs filed suit in this Court against Hatton and PDT on October 28, 2022, and requested a temporary restraining order ("TRO") and preliminary injunction ("PI") on the same day.  (*See* ECF Nos. 1, 5, 2:22-cv-03838 (S.D. Ohio)).  After the Court held a Rule 65.1

Conference, the parties agreed to a stipulated TRO (ECF No. 23). Defendants sought to dismiss the action pursuant to Rule 12(b)(6), and that motion is now ripe for review. Since then, this action has been consolidated with another case between the Presidio plaintiffs and PDT in this Court. There is also an on-going case, involving related issues, in the Eastern District of Michigan. (*See generally* ECF, 4:22-cv-10098 (E.D. Mich.)).

### III.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) operates to evaluate the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Accordingly, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). Although the court's primary focus will be on the allegations in the complaint, the court may also consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (internal quotations omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And though the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

## IV.    LAW & ANALYSIS

The issues presented in this motion implicate the complexities and nuances of corporate structure and formation. Organizations frequently establish multiple layers of corporate entities, some of which own some portion (or all) of the others, directly or indirectly. And the law has traditionally recognized that each such corporation is a separate entity, even where one corporation wholly owns or is wholly owned by another. *See, e.g.*, *Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, ¶ 40, 2006-Ohio-6553, 861 N.E.2d 109, 117 (Ohio 2006) ("[P]arent and subsidiary corporations are separate and distinct legal entities[.]"); *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[O]ur corporation law is largely built on the idea that the separate legal existence of corporate entities should be respected—even when those separate corporate entities are under common ownership and control."). It is the precise nature of the relationships between the various Presidio plaintiffs—the internal network of which entity owns the other, and the extent to which that ownership translates to control—that is at the crux of Defendants' arguments for dismissal.

The Complaint alleges four claims: first, that Hatton breached his contracts with the Presidio plaintiffs; second, that Defendants tortiously interfered with PNS's business relationships with certain of its customers (specifically, the customers Hatton previously serviced while working

6

at PNS); third, that PDT tortiously interfered with Hatton's employment agreements with PNS, inducing him to leave PNS and violate the Hatton Agreements; and fourth, that Defendants engaged in unfair competition, when Hatton (on behalf of PDT) told a PNS customer that the PNS security engineer assigned to that customer for security network projects was "too busy" to work on the projects. (Compl. ¶¶ 71–105, ECF No. 1). Defendants argue that all four claims must be dismissed—the first three for lack of a valid, enforceable contract between Hatton and PNS at the time of his departure, because, though PNS was the Presidio subsidiary that actually employed Hatton, it was not the Presidio subsidiary that bought Netech and was thus never assigned Netech's rights and obligations. The Court addresses each claim in turn.

### A. Breach of Contract (Count I)

A breach of contract is established under Ohio law where the plaintiff shows: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff." *Wellington Res. Grp. LLC v. Beck Energy Corp.*, 975 F. Supp. 2d 833, 837 (S.D. Ohio 2013) (citation omitted). In brief, Plaintiffs allege that Hatton breached the Hatton Agreements when he left PNS last summer, immediately joined PDT, and began soliciting and working with former PNS clients. Defendants focus on the first element, arguing that the Hatton Agreements are no longer applicable and cannot be enforced by Plaintiffs; they make no arguments disputing the other three elements. (*See generally* Mot. to Dismiss, ECF No. 19-1).

Understanding Defendants' argument requires first unpacking the relationship between the various Presidio entities and how the legal rights and obligations flowing from the Hatton Agreements passed between those entities. The Hatton Agreements required that Hatton refrain from engaging with or soliciting clients of Netech Corporation "[d]uring the course of [his] employment with Netech and for 12 months thereafter." (Defs.' Ex. B, ECF No. 19-3). Hatton's

employment with Netech ended on February 1, 2016, when PIS purchased Netech's assets and assumed Netech's agreements, including the Hatton Agreements.  The AAA between PIS and Netech assigned Netech's rights (including the rights and obligations in the Hatton Agreements) to PIS, its legal representatives, and its successors, but explicitly prohibited further assignment of those rights and obligations by PIS to any other person except its parent, Presidio Holdings, without the prior written consent of the other party.  Although PIS now held the rights set forth in the Hatton Agreements, Hatton never worked for PIS or for PNSG, the successor by merger of PIS; instead, he began working for PNS, the parent of PNSG.

Based on the foregoing, Defendants first argue that none of the Presidio plaintiffs has the authority to enforce the Hatton Agreements.  In making this argument, Defendants focus on the fact that PNS is a separate entity from PNSG and thus must be treated separately; PNS, therefore, has no right to assert the rights that were assigned from Netech to PIS (and then to PNSG).  (*See* Mot. to Dismiss at 11, ECF No. 19-1).  Defendants also argue that, even if PNS were authorized to enforce the Hatton Agreements, Hatton's obligations pursuant to those contracts have now expired.  This is because, according to Defendants, he stopped working for Netech on February 1, 2016, and never worked for PIS (or PNSG), the counter-parties to the acquisition.  Accordingly, the twelve-month non-compete and non-solicitation periods began running on February 1, 2016, and expired on February 1, 2017.  (*Id.* at 6–9).

As a threshold matter, in the "Continuation of Employment" clause of the APA, the parties agreed that "Buyer will offer, or cause its applicable Affiliate to offer, employment to each Business Employee . . . ."  (Pls.' Ex. 2 § 5.6(a), ECF No. 31-2).  This is the provision by which

Hatton transitioned from an employee at Netech to an employee of PNS—an "Affiliate" of PIS,[3] who was the "Buyer"—upon the closing of the purchase agreement. Once the acquisition closed, PNS offered Hatton employment, which he accepted. That the APA expressly contemplated Hatton's employment by either PIS or its affiliate suggests his employment at PNS should be considered "continuous" with his employment at Netech and not a distinct employment.

Defendants counter that, because this provision contemplates that a Presidio affiliate would "offer" employment to each Netech employee, Hatton's employment with PNS was a new term of employment and not, strictly speaking, a continuation of his Netech employment. (*See* Defs.' Reply Br. at 2, ECF No. 34). But Defendants appear to acknowledge that Hatton would have continued to be bound by the Hatton Agreements if he had been employed by PIS immediately after the acquisition of Netech. (*Cf.* Mot. to Dismiss at 4, ECF No. 19-1) ("[Hatton] separated from employment with Netech (and Netech's successor, PIS) as of February 1, 2016. As a result, the one-year-clock on Mr. Hatton's contractual obligations started in 2016 . . . ."). And that makes sense. After all, it would be counter to the reasonable expectation of that parties to a merger and acquisition if not even the buyer, who was indisputably assigned the rights and obligations of the seller, could enforce those rights and obligations. PIS's purchase was for the entirety of Netech, including the assumption of Netech's employee agreements and the rights therein, in addition to the employment of those personnel.

The language highlighted by Defendants in the APA, however, uses the same "offer" language with respect to the "Buyer" (*i.e.*, PIS) as to "its applicable Affiliate" (*i.e.*, PNS). The Court presumes that two instances of the same wording in the same provision of the same contract

---

[3] "Affiliate" is defined in the APA as "any Person, any other Person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person." (APA art. 9). The parties do not dispute that PNS is an "affiliate" of PIS.

must be read in the same manner.  In that case, if employment at PIS post-acquisition would have been considered "continuous" with Netech employment,[4] then so too should employment at a PIS affiliate such as PNS—especially where that alternative is explicitly laid out in the APA.  Nor have Defendants pointed to any caselaw indicating that employment by an acquiring corporation (or its affiliates, if so designated by contract) is not "continuous," but rather a new term of employment. The sole case relied on by Defendants to the contrary is *CDW, LLC, v. NETech Corp.*, in which the Southern District of Indiana noted that "transfers of employment from one such entity to another, whether to perform the identical duties, under identical circumstances, in the same place, marked the end of employment with one entity and the beginning of employment with another." 1:10-cv-00530, 2012 WL 527449, at *7 (S.D. Ind. Feb. 16, 2012).  But that determination was made in the context of employees who had switched from one company to its sister subsidiary; it did not involve, on the other hand, an acquisition and a corresponding contract explicitly authorizing continued employment at the buyer's affiliates.  As such, this Court concludes that, in the absence of evidence to the contrary, Hatton's employment at PNS was "continuous" with his employment at Netech as contemplated by the APA and that the Hatton Agreements' restrictions apply vis-à-vis PNS.  The Hatton Agreements therefore expired in July 2022, at which time the twelve-month non-solicitation and non-compete terms began to run.

The argument that Plaintiffs' breach of contract claim must be dismissed for failure to state a claim because none of the Presidio entities bringing suit has the authority to enforce the Hatton Agreements is more persuasive.  As set forth above, Defendants suggest that the only entities with that authority are: Netech, the original employer; PIS, the purchaser of Netech and the Presidio

---

[4] To the extent that Defendants argue in their reply brief that even employment with PIS would not have been considered continuous, that argument was not raised in their Motion to Dismiss and thus will not be considered.  *See Ross v. Choice Hotels Int'l*, 882 F. Supp. 2d 951, 958 (S.D. Ohio 2012) (collecting cases); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)

entity to whom Netech's rights and obligations were assigned under the AAA; Presidio Holdings, the other Presidio entity named in the AAA as having the legal right to enforce the purchased Netech rights and obligations; and PNSG, as the successor of PIS. (*See* Mot. to Dismiss at 11–12, ECF No. 19-1). Notably, this list does not include PNS, the Presidio entity that employed Hatton after the purchase of Netech.

The AAA makes explicit that "[t]he terms of this Agreement will be binding upon, inure to the benefit of and be enforceable by and against such party and its legal representatives, successors and authorized assigns." (Defs.' Ex. C § 4, ECF No. 19-4). Based on this language, Plaintiffs counter that PNS has the authority to enforce the Hatton Agreements as a "legal representative" of PNSG, by virtue of being the parent corporation of PNSG. (*See* Pls.' Resp. in Opp'n at 14–15, ECF No. 31). There is no indication, however, that PIS was the "legal representative" of PNSG or that its status as PNSG's parent inherently gives it the authority to act as the "legal representative," and Plaintiffs provide no caselaw or documentation to that effect. After all, the common understanding of "legal representative" in the corporate law context is someone who has the legal authority to act on behalf of a corporate entity. *See also Representative*, Black's Law Dictionary (11th ed. 2019) (defining "legal representative" as either a "lawful representative," *i.e.*, a legal heir or an executive, administrator or other legal representative, or a "personal representative"); *cf. Bass v. Leatherwood*, 788 F.3d 228, 230 (6th Cir. 2015) ("[U]nder longstanding tradition, 'a corporation can only appear by an attorney'" (quoting *Osborn v. Bank of U.S.*, 222 U.S. (9 Wheat.) 738, 829 (1824))). Moreover, the fact that neither the AAA nor the APA provides a definition of "legal representative" suggests that the parties understood and incorporated the default understanding of the term in the transaction.

Additionally, courts have traditionally acknowledged and respected "the separate identity of corporations and their subsidiaries." *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, ¶ 66, 29 N.E.3d 313, 328 (Ohio Ct. App. 2015). This is true even where the parent wholly owns the subsidiary. *See, e.g.*, *Glidden Co.*, 861 N.E.2d at 117. Thus, a parent corporation generally cannot be held liable for the actions of its subsidiary (except, of course, where the corporate veil may be pierced). *See Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, ¶¶ 7–8, 2009-Ohio-1247, 905 N.E.2d 613, 616 (Ohio 2009). Similarly, "under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent corporation will not be liable for the obligations of its subsidiaries." *Tenn. Valley Auth. v. Exxon Nuclear Co., Inc.*, 753 F.2d 493, 497 (6th Cir. 1985) (citing 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 43 (perm. ed., rev. vol. 1983)). It follows that if a parent cannot normally be held liable for the obligations and liabilities of its subsidiary, then a parent also cannot normally wield the authority to enforce the rights of its subsidiary. *Cf. Hamilton Partners, L.P. v. England*, 11 A.3d 1180, 1208 (Del. Ch. 2010) (noting that, under Delaware corporate law,[5] "[t]he parent corporation does not receive the right to sue as a result of the merger and cannot assert directly the right of the subsidiary"); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081 n.13 (Del. 2011) (suggesting that a parent may enforce the claims of a wholly-owned subsidiary either indirectly, *i.e.*, through a derivative action, or by causing the subsidiary to enforce the claim by "direct exercise of its 100 percent control" of the subsidiary).

The traditional understanding of independent corporate entity stands firm in the face of Plaintiffs' cited cases and arguments about contractual intent. Plaintiffs rely primarily on this Court's decision in *Prosonic Corp. v. Stafford*, in which the plaintiff subsidiary was granted leave

---

[5] PNS is a Florida LLC, PNSG is a Delaware LLC, and Presidio, Inc. is a Delaware corporation. (Compl. ¶¶ 9–11, ECF No. 1).

to amend its complaint to add its parent corporation.  *See generally* No. 2:07-cv-00803, 2008 WL 11351574.  In that decision, this Court concluded that "recent Ohio case law establishes that 'a non-signatory parent corporation can enforce' agreements made between an individual and a subsidiary corporation."  *Id.* at *3 (quoting *Nefores v. Branddirect Mtkg., Inc.*, No. 02-0012, 2002 WL 31057387, at *6 (Ohio Ct. App. Sept. 14, 2002)).  The Ohio state court decisions referenced and relied upon in arriving at that conclusion were about arbitration agreements.  Plaintiffs are correct, of course, that arbitration is a matter of contract law.  (*See* Pls.' Resp. in Opp'n at 15–16, ECF No. 31).  But, even in acknowledging arbitration's roots in contract law, this Court would be remiss to ignore the fact that federal and state law have consistently made explicit that public policy favors arbitration.  *See Gerig v. Kahn*, 95 Ohio St.3d 478, ¶ 20, 2002-Ohio-2581, 769 N.E.2d 381, 386 (Ohio 2002); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) ("The [Federal Arbitration] Act, this Court has said, establishes 'a liberal federal policy favoring arbitration agreements.'" (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))).  *But see* Jodi Wilson, *How the Supreme Court Thwarted the Purpose of the Federal Arbitration Act*, 63 CASE W.L. REV. 91 (2012) (suggesting that the oft-repeated idea that the FAA "favors" arbitration is, in fact, counter to congressional intent).  And stemming from the policy in favor of arbitration, "many federal and state courts have recognized exceptions to the rule that a person cannot be compelled to arbitrate a dispute which he did not agree to submit to arbitration," *Gerig*, 769 N.E.2d at 386 (collecting cases), thus leading to the conclusion that a non-signatory can be bound by or enforce an arbitration agreement.  There is no indication, however, that corporate law contains the same carve-out from its default understanding of parent-subsidiary relations, especially in the absence of any similar public policy considerations.

Moreover, it is not the case that respecting the divide between parent and subsidiary would be contrary to the commercially reasonable expectations of the parties. (*See* Pls.' Resp. in Opp'n at 13, ECF No. 31). In the first instance, all parties to the acquisition of Netech were sophisticated corporate actors. The Court does not read the AAA or APA so restrictively as to find the agreements and assets purchased by PIS to be "worthless." (*Id.*). PIS validly purchased substantial assets, including, as noted above, the rights and obligations from the Netech employment contracts. These substantial assets then transferred to PNSG, as PIS's successor by merger. The narrow issue here, however, is the authority of PNS to enforce those rights and obligations (and not, for example, the rights held by PNSG).[6]

The Court concludes that PNS lacks the authority to enforce the Hatton Agreements, as it was not the legal representative or successor of PIS and was not assigned the rights of the Hatton Agreements, despite employing Hatton post-acquisition. Accordingly, Defendants' motion is **GRANTED** as to the breach of contract claim.

### B.    Tortious Interference Claims (Counts II and III)

Plaintiffs allege two counts of tortious interference: first, tortious interference with business relationships against all Defendants; and second, tortious interference with contract against PDT. Defendants assert that the contract question set forth above is determinative of their motion to dismiss on both counts. (*See* Mot. to Dismiss at 13, ECF No. 19). Thus, Defendants argue that, because the Hatton Agreements expired in 2016 and cannot be enforced by PNS, both tortious interference claims must fail. But while it is true that the first element of a tortious

---

[6] Although PNSG has the authority to enforce the agreements as PIS's successor by merger, Hatton was not employed by PNSG and has not solicited or competed against PNSG; PNSG cannot assert claims for injuries to its parent, PNS. As Plaintiffs do not defend against the motion to dismiss on this basis, the Court does not address the issue in detail. (*See generally* Pls.' Resp. in Opp'n at 11–16, ECF No. 31). Likewise, Plaintiffs do not argue or allege that the confidentiality provisions of the Presidio Employee Handbook, which Hatton reviewed and acknowledged but did not sign upon joining PNS, are sufficient to establish a breach of contract claim and warrant denial of the motion to dismiss. (*See generally id.*). Accordingly, the Court does not address that potential argument either.

interference with contract claim under Ohio law is the existence of a contract,[7] *see Georgia-PacificConsumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012) (citing *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942 (S.D. Ohio 2012)), and thus that claim turns on the existence of a contract, that does not apply to tortious interference with business relationship claims. This is because a tortious interference with a business relationship claim requires a plaintiff to prove: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages therefrom." *Kelley v. Buckley*, 193 Ohio App.3d 11, ¶ 56, 2011-Ohio-1362, 950 N.E.2d 997, 1013 (Ohio Ct. App. 2011) (citation omitted).

Plaintiffs have alleged that Defendants were aware of PNS's business relationships with the customers that Hatton serviced as a PNS employee and intentionally interfered with those relationships, to PNS's detriment. (*See* Compl. ¶¶ 85–94, ECF No. 1). Although the Complaint specifies that the intentional interference was "in direct violation of the Hatton Agreements," this additional caveat about the non-compete and non-solicitation agreements is not a necessary element of the claim; Plaintiffs need only plead plausible allegations of an "intentional interference causing a breach or termination of the relationship" to establish their claim. *See Kelley*, 950 N.E.2d at 1013. Defendants provide no argument suggesting that Plaintiffs have failed to do so.

Because Defendants' lack-of-contract argument fails to identify any deficiencies with Plaintiffs' pleadings on their tortious interference with business relationships claim, the motion is **DENIED** as to Count II. But because, as discussed above, this Court concludes that the Hatton Agreements cannot be enforced by PNS, there is not a valid contract from which the tortious

---

[7] The other elements are the wrongdoer's knowledge of the contract, the wrongdoer's intentional procurement of the contract's breach, the lack of justification, and resulting damages.

interference with contract claim may flow.  Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to that claim.

### C.        Unfair Competition (Count IV)

An unfair competition claim requires a plaintiff to show that the defendant "made representations 'for the purpose of deceiving the public, that his goods are those of another'" or engaged in other "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, designed to harm the business of another." *Campfield v. Safelite Grp., Inc.*, No. 2:15-cv-02733, 2022 WL 721772, at *4 (S.D. Ohio Feb. 11, 2022) (quoting *Water Mgmt., Inc. v. Stayanchi*, 472 N.E.2d 715, 717 (Ohio 1984)).  Count IV of Plaintiffs' complaint alleges that Defendants have engaged in unfair competition through Hatton's false statements to a PNS client that the PNS engineer assigned to that client was "too busy" to complete work for the client and that, as a result, PNS has not heard back from the client regarding that project.  (Compl. ¶¶ 104–05, ECF No. 1).

Defendants argue not that the statements made by Hatton were true, but rather that Plaintiffs have failed to plead adequately that the statement was "designed to harm [Presidio's] business" or that "it actually did harm Presidio's business."  (Mot. to Dismiss at 14, ECF No. 19) (first quoting *Stayanchi*, 472 N.E.2d at 717; then citing *Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, 864 F.3d 455, 458 (6th Cir. 2017)).  But, accepting Plaintiffs' pleadings as true, the statements made by Hatton have caused the customer, with whom the PNS security engineer previously had a strong relationship, to cease contacting Plaintiffs for assistance with their network security issues.  In short, Plaintiffs allege that they have lost a client as a result of Defendants' false comments.[8]  Further, it requires a serious stretch of the imagination to interpret Plaintiffs'

---

[8] Defendants state that "[n]owhere in Plaintiffs' complaint do they allege that Mr. Hatton's purported statements to the customer actually caused that customer to switch its business to PDT."  (Defs.' Reply in Supp. at 13,

allegation that Hatton told the client to hire PDT instead of PNS as lacking intent to harm Plaintiffs' business. (*See* Compl. ¶ 63, ECF No. 1).

Accordingly, this Court **DENIES** the motion to dismiss with respect to Count IV.

## V.    CONCLUSION

For the reasons stated above, the Defendants' Rule 12(b)(6) Motion to Dismiss (ECF No. 19) is **GRANTED IN PART and DENIED IN PART**. Plaintiffs' breach of contract and tortious interference claim with contract claims (Counts I and III) are **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

/s/Algenon L. Marbley

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: August 9, 2023**

---

ECF No. 34). But that does not appear to be true; the Complaint states: "As a direct result of Defendants' conduct, Plaintiffs lost business opportunities with [the customer] . . . ." (Compl. ¶ 104, ECF No. 1). Defendants have not provided caselaw indicating that Plaintiff must allege not only that it lost business opportunities with a customer, but also that that customer switched its business to the defendant. In fact, the caselaw that Defendants do cite on this issue addresses the lack of evidence presented of an unfair competition claim at the summary judgment stage, not at the motion to dismiss stage—where, of course, a plaintiff need not present any evidence at all.